No. 21-1678

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

TYRONE HENDERSON, SR., GEORGE O. HARRISON, JR., AND ROBERT MCBRIDE,
individually and on behalf of other similarly situated,

*Plaintiffs-Appellants*,

v.

THE SOURCE FOR PUBLIC DATA, L.P., D/B/A PUBLICDATA.COM, SHADOWSOFT, INC.,
HARLINGTON-STRAKER STUDIO, INC., DALE BRUCE STRINGFELLOW,

*Defendants-Appellees*.

_____

On Appeal from the United States District Court
for the Eastern District of Virginia at Richmond
Case No. 3:20-cv-00294-HEH (The Honorable Henry E. Hudson)

_____

## NATIONAL CONSUMER LAW CENTER, ET AL. *AMICI CURIAE* BRIEF
## IN SUPPORT OF APPELLANTS AND REVERSAL

_____

John G. Albanese
Ariana Kiener
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel.: 612.594.5999
Fax: 612.584.4470
jalbanese@bm.net
akiener@bm.net

*Counsel for Amici Curiae National Consumer Law Center, Upturn, American Civil
Liberties Union, National Housing Law Project, National Employment Law Project,
and National Low Income Housing Coalition*

# TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..............................4

ARGUMENT ...............................................................................................5

    I.  The FCRA Is a Critical Tool to Protect Workers, Renters, and Other Consumers from Abuses by the Background Check Industry ................5

    A. Origins of the FCRA .............................................................5

    B. Background Screening Industry Today ..................................7

    C. The Impacts of Inaccurate Reporting on Consumers and How the FCRA Has Helped ..............................................................14

    II. Section 230 Does Not Immunize Background Check Companies and Other CRAs from Complying with Their Obligations Under the FCRA ...............................................................................................21

    A. None Of The Statutory Obligations Enumerated In the Plaintiffs' Complaint Require A Court to Treat A CRA As The Publisher Or Speaker Of Third-Party Content ..................................................22

    B. CRAs Are Not Eligible for Section 230 Protection When They Create and Develop Content ..............................................27

CONCLUSION ...........................................................................................29

# TABLE OF AUTHORITIES

<u>Cases</u>

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) .......................23, 25

*Berry v. Schulman*, 807 F.3d 600 (4th Cir. 2015) ..........................21

*Brown v. Equifax Info. Servs., LLC*, No. 09-CV-0168, 2010 WL 11647403 (N.D. Ga. Feb. 16, 2010) .......................23

*Cortez v. Trans Union, L.L.C.*, 617 F.3d 688 (3d Cir. 2010) ...................24, 25

*Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409 (4th Cir. 2001) ...........24, 25

*Diamond Ranch Academy v. Filer*, No. 14-751, 2016 WL 633351 (D. Utah Feb. 17, 2016) .......................28

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016) ...................25, 26

*Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008) .......................25

*Fraley v. Facebook*, 830 F. Supp. 2d 785 (N.D. Cal. 2011) ...................27

*FTC v. Accusearch Inc.,* 570 F.3d 1187 (10th Cir. 2009) ...................22

*Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532 (E.D. Pa. 2012) .......................12

*Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329 (9th Cir. 1995) ...........6

*Henderson v. Corelogic Nat'l Background Data, LLC*, 161 F. Supp. 3d 389 (E.D. Va. 2016) .......................20

*Henson v. CSC Credit Services*, 29 F.3d 280 (7th Cir. 1994) ...................24

*HomeAway.com v. Santa Monica*, 918 F.3d 676 (9th Cir. 2019) ...............26

*Koropoulos v. Credit Bureau, Inc.*, 734 F.2d 37 (D.C. Cir. 1984) ...............24

*Obabueki v. IBM*, 145 F. Supp. 2d 371 (S.D.N.Y. 2001) ...................23

*Sarver v. Experian Information Solutions*, 390 F.3d 969 (7th Cir. 2004) ...........24

*Williams v. First Advantage LNS Screening Sols., Inc.*, 238 F. Supp. 3d 1333 (N.D. Fla. 2017) .......................15, 16

ii

Rules & Statutes

15 U.S.C. § 1681, *et seq.* ................................................................... *passim*

47 U.S.C. § 230 ................................................................................... *passim*

Other Authority

American Civil Liberties Union, *Unfair Eviction Screening Policies Are Disproportionately Blacklisting Black Women* (March 30, 2017) ....................... 17

Brennan Center for Justice, *Just Facts: As Many Americans Have Criminal Records as College Diplomas* (2015) ................................................................. 17

Consumer Financial Protection Bureau, *Market Snapshot: Background Screening Reports* (2019) ........................................................................ 7, 8, 9, 12

Consumer Financial Protection Bureau, *Consumer Financial Protection Bureau Settles with Employment Background Screening Company* (Nov. 22, 2019) ........... 19

Equal Employment Opportunity Commission, *Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act* ....................................................... 17

FBI Uniform Crime Reporting Program, *Crime in the United States 2016* ......... 16

Federal Trade Commission, *Texas Company Will Pay $3 million to Settle FTC Charges That it Failed to Meet Accuracy Requirements for its Tenant Screening Reports* (Oct. 16, 2018) ...................................................................... 19

Federal Trade Commission, *Dissenting Statement of Commissioner Rohit Chopra* (Dec. 8, 2020) ................................................................................ 18

Federal Trade Commission, *Tenant Background Report Provider Settles FTC Allegations that it Failed to Follow Accuracy Requirements for Screening Reports* (Dec. 8, 2020) ................................................................................ 19

iii

HUD, *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* (April 4, 2016) ................................................. 17

Lauren Kirchner & Matthew Goldstein, *Access Denied: Faulty Automated Background Checks Freeze Out Renters*, The Markup & N.Y. Times, May 28, 2020, ................................................................................................................. 13

National Consumer Law Center, *Broken Records Redux: How Errors by Criminal Background Checking Companies Harm Consumers Seeking Jobs and Housing* (2019) ............................................................................................. *passim*

National Consumer Law Center, *Salt in the Wound* (Aug. 2020) ...................... 8

National Consumer Law Center*, Mismatched and Mistaken*: *How the Use of an Inaccurate Private Database Results in SSI Recipients Unjustly Losing Benefits* (Apr. 2021) ................................................................................................. 20

TransUnion SmartMove, *TransUnion Independent Landlord Survey Insights* (Aug. 7, 2017) .................................................................................................... 8

## INTEREST OF *AMICI CURIAE*

The National Consumer Law Center ("NCLC") is a national nonprofit research and advocacy organization. NCLC draws on over fifty years of expertise regarding the Fair Credit Reporting Act ("FCRA" or "Act") and its protections for consumers. NCLC provides information, legal research, and policy analysis to Congress, state legislatures, administrative agencies and courts. NCLC publishes Fair Credit Reporting (9th ed. 2017), the definitive treatise on the FCRA. Its interest in this appeal flows from its efforts to protect the integrity of the FCRA and the rights of consumers under the Act.

Upturn is a national nonprofit research and advocacy organization that promotes equity and justice in the design, governance, and use of technology. One of Upturn's key priorities is advancing economic opportunity, especially for people who have historically suffered discrimination.

The American Civil Liberties Union ("ACLU") is a nationwide, non-partisan organization with approximately two million members and supporters dedicated to the principles of liberty and equality embodied in the United States Constitution. The ACLU works to promote and safeguard individuals' civil rights and civil liberties, including constitutional and statutory speech rights and protections against discrimination, and engages in nationwide litigation and advocacy regarding the intersection of digital technology with these rights and liberties.

The National Low Income Housing Coalition ("NLIHC") is a nonprofit membership organization dedicated to achieving socially just public policy that ensures the lowest income people have decent, accessible and affordable homes. In furtherance of this goal, NLIHC collaborates with federal partners to improve access to affordable housing for people with a conviction history, who are at higher risk of homelessness, including submitting recommendations to Congress and the U.S. Department of Housing and Urban Development ("HUD") on ways to expand access to affordable, accessible homes for marginalized individuals.

The National Housing Law Project is a nonprofit organization that advances tenants' rights, increases housing opportunities for underserved communities, and preserves and expands the nation's supply of safe and affordable homes. Fairness and accuracy in background reports is a critical component of ensuring individuals and families have access to decent and suitable housing.

The National Employment Law Project is a nonprofit organization that advocates for a just and inclusive economy in which all workers have expansive rights and thrive in good jobs. That economy is unobtainable while unfair job barriers continue to hold back millions of people with arrest and conviction records, who are disproportionately Black, Latinx, and Indigenous.

No party's counsel authored this brief in whole or in part. No party, party's counsel, or any other person other than *amici curiae*, contributed money that was

2

intended to fund preparing or submitting this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

For over 50 years, the FCRA has provided vital and necessary protections for people who are the subjects of inaccurate consumer reports. Today, the consumer reporting industry is booming. Technological advancements have dramatically enhanced the ability of background check companies, tenant screening companies, and other consumer reporting agencies ("CRAs") to collect, aggregate, and analyze data. Through web-based platforms or integrated software programs, CRAs create reports that frequently contain errors, including inaccurate criminal records and eviction histories. These companies' failure to ensure accuracy wrongly deprives consumers of jobs, housing, and other opportunities. Through the FCRA, consumers have been able to obtain redress against these companies. In this era of Big Data, the FCRA's protections have renewed vitality and importance, often providing the only method of obtaining meaningful relief for a person who has been wrongly deprived of credit, housing, or employment.

*Amici* recognize the essential role that the FCRA plays in protecting people's access to important life and economic opportunities. In particular, *amici* are concerned about the effect that the district court's decision will have on workers, renters, and other consumers who are harmed because of the sale of criminal background checks and eviction records that have not been subjected to the accuracy procedures required by the FCRA.

4

The district court's decision to apply 47 U.S.C. § 230 ("Section 230") to the FCRA claims brought by the Plaintiffs has far-reaching consequences that extend beyond The Source for Public Data's practices. While the original intent of Section 230, to ensure free expression rights on the internet by affording protections, is critical, Section 230 must not — and need not — be interpreted to vitiate the critical protections of the FCRA to accomplish these goals. Indeed, the plain text of Section 230 makes clear that it simply does not apply to the FCRA-regulated conduct at issue in this case. If the district court's decision is not reversed, this case will potentially allow CRAs that rely on computers and the internet — which, today, is virtually all of them — to escape the FCRA's reach, and gut the Act's protections for people harmed by the shoddy business practices of FCRA-violating CRAs. Reversal is appropriate.

## ARGUMENT

### I.    The FCRA Is a Critical Tool to Protect Workers, Renters, and Other Consumers from Abuses by the Background Check Industry

#### A. Origins of the FCRA.

In 1970, Congress passed the FCRA to address two related concerns. First, background checks, credit reports, and other consumer reports were playing an increasingly central role in people's lives at crucial moments, such as when they applied for housing, credit, or employment. Second, despite their importance, these

5

consumer reports were unregulated and had widespread errors and inaccuracies, thereby impairing people's access to employment, housing, and other critical opportunities.

Recognizing that unregulated background check companies and the inaccurate reports they were producing were harming the economy, as well as individuals, Congress set out to overhaul the background reporting industry. Because inaccuracies in background checks can wrongfully deprive people of important opportunities, such as jobs and housing, ensuring the accuracy of such reports is a foundational goal of the FCRA. *See Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) ("[The FCRA] was crafted to protect consumers from the transmission of inaccurate information about them and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner."). For this reason, the FCRA sets a high standard of accuracy for companies that prepare background checks, requiring that they "follow reasonable procedures to assure maximum possible accuracy of the information" within their reports on consumers. 15 U.S.C. § 1681e(b).

Another goal of Congress in passing the FCRA was to protect the privacy of consumers from inappropriate and unnecessary dissemination of the sensitive information in consumer reports. 15 U.S.C. § 1681(a)(4) ("There is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness,

6

impartiality, and a respect for the consumer's *right to privacy*.") (emphasis added). Thus, the FCRA limits the parties to whom a CRA may provide a consumer report to only those users who have a permissible purpose under the Act, e.g., credit, employment, insurance.  15 U.S.C. § 1681b.

## B. Background Screening Industry Today.

The FCRA's protections for consumers have only become more important over the last two decades, during which the background check industry has grown — and changed — tremendously.[1] The background screening industry now exercises staggering power in hiring and rental decisions, as landlords and employers routinely procure screening reports to evaluate potential tenants or employees. Today, millions of criminal background checks are sold each year, with approximately 94% of employers and 90% of landlords using such checks to evaluate prospective employees and tenants.[2] About 85% of landlords also purchase

---

[1] Consumer Financial Protection Bureau ("CFPB"), *Market Snapshot: Background Screening Reports*, 3 (2019), available at https://files.consumerfinance.gov/f/documents/201909_cfpb_market-snapshot-background-screening_report.pdf (hereinafter "Market Snapshot").

[2] National Consumer Law Center, *Broken Records Redux: How Errors by Criminal Background Checking Companies Harm Consumers Seeking Jobs and Housing*, 7, 3, (2019), available at https://www.nclc.org/images/pdf/criminal-justice/report-broken-records-redux.pdf (hereinafter "Broken Records Redux").

an eviction report on all applicants,[3] often automatically rejecting applicants who have an eviction record on their tenant screening report.[4]

This increased reliance on background screening has led to a multi-billion-dollar industry that now includes thousands of background screening companies. For example, in 2019, an estimated 1,954 background screening CRAs collectively took in revenues of $3.2 billion.[5] All told, background checks, particularly those involving criminal background and eviction record information, are more prevalent — and, for the companies that create them, more lucrative — than when the FCRA was enacted.

The industry has also changed significantly, due largely to the rise of the internet, online services, and other technological advancements that have made it easier and cheaper for companies to aggregate data about people and create background check products.[6] First, the growth of digitized and online access to public records has enabled more companies to enter the background check industry in the first place — and made it possible for them to incorporate and analyze even

---

[3] TransUnion SmartMove, *TransUnion Independent Landlord Survey Insights* (Aug. 7, 2017), available at https://www.mysmartmove.com/SmartMove/blog/landlord-rental-market-survey-insights-infographic.page.

[4] National Consumer Law Center, *Salt in the Wound* (Aug. 2020), available at https://www.nclc.org/images/pdf/special_projects/covid-19/IB_Salt_in_the_Wound.pdf.

[5] Market Snapshot, *supra* note 1, at 4.

[6] *Id.*; Broken Records Redux, *supra* note 2, at 7.

more records in their reports.[7] In fact, nearly all — 96% — of the approximately 110

million criminal history records maintained by state criminal history repositories are

now maintained electronically.[8]

In addition, the widespread availability of electronic criminal and eviction

records along with other technological updates have essentially moved the entire

background check process and industry online. From start to finish, employment and

tenant screening generally takes place through interactive computer- and web-based

services, whether through a screening company's (1) online portal or (2) web

integration with the employer's applicant tracking system or landlord's residential

management systems.[9]

---

[7] Market Snapshot, *supra* note 1, at 5 ("With the growth of digitized and online access to public records, some companies, including even some smaller companies, can offer national criminal searches."); *id.* at 11 ("Advances in information technology have made it easier to obtain access to criminal records, either directly through digitized court records, through state criminal repositories, or from private databases (third party or internally generated) that collect public criminal records."); Broken Records Redux, *supra* note 2, at 9 ("[T]he internet has facilitated the emergence of online background screening companies that have instant access to millions of databases containing criminal records information."); Sterling, *Criminal Background Checks*, https://www.sterlingcheck.com/services/criminal-background-checks/ ("With CourtDirect, our proprietary automation technology, Sterling has digital access to 85% of US criminal search records.").
[8] Broken Records Redux, *supra* note 2, at 9.
[9] HireRight, *HireRight Partners*, https://www.hireright.com/partners (describing integrations with "the industry's leading HR services and Applicant Tracking (ATS) providers"); Checkr, *Staffing*, https://checkr.com/solutions/industries/staffing/ (describing partner integrations with "ATS and HRIS systems that [customers are] already using, so [they] can start transforming the background check experience right    away"); Asurint,    Integrations    &    Partners,

9

While there are variations from company to company, the general process of ordering, matching records for, creating, and distributing a background check — which can occur within a matter of minutes — is set forth below.[10]

- **The application.** A consumer completes a job or rental application.

- **The order and authorization.** The employer or landlord orders a background report online through the CRA's web portal or web-based integration. The consumer provides authorization and necessary information for the report to be run, often via an online candidate portal.[11]

- **Matching records.** The screening company, not the employer or landlord, then matches records with the consumer in question. The screening company does so using criteria that the company selects and programs in order to match the worker or renter with criminal and/or eviction records in giant databases

---

https://checkr.com/platform/screenings/criminal-records-check (explaining that Asurint "work[s] with a range of experienced partners and integrations across industries and disciplines").

[10] Sterling, *Criminal Background Checks*, https://www.sterlingcheck.com/services/criminal-background-checks/ (stating that Sterling's "CourtDirect technology enables [Sterling] to expand [its] digital access to court records," allowing the company to complete 60% of criminal background searches in 15 mins, 70% in an hour, and 90% in a day).

[11] Checkr, *Candidate Portal*, https://candidate.checkr.com/view#login; Sterling, *My Background Check*, https://mybackgroundcheck.sterlingcheck.com/?utm_source=Sterling&utm_medium=mybackgroundcheck_nav&utm_campaign=candidate_website ("You'll set up a Candidate Hub account…Use your email address and password to log into your Candidate Hub account as needed as you go through the screening process.").

of aggregated data.[12] These databases are private, proprietary, and actively assembled, often by third party vendors, though some large companies assemble and maintain their own databases.[13] The data assembled by the screening companies is generally purchased in bulk, often through intermediaries, from a variety of sources such as law enforcement agencies, state courts, corrections offices, and criminal record repositories, or obtained using web scraping technology.[14] The matching criteria selected by the screening company primarily consist of the consumer's personally identifying information, such as name and date of birth.[15] Unfortunately, as discussed below, matching criteria are often overly loose and incorrectly associate a worker or renter to a record that does not belong to them.

---

[12] Broken Record Redux, *supra* note 2, at 10; RealPage, *Resident Screening*, https://www.realpage.com/apartment-marketing/resident-screening/ (stating that RealPage's criminal history search offers "[a]ccess to a comprehensive online national database that automatically searches its entire criminal and sex offender registry"); Checkr, *Criminal Records Checks*, https://checkr.com/platform/screenings/criminal-records-check (stating that Checkr's National Criminal Records Check "queries over 900 million records"); Asurint, *Our Technology*, https://www.asurint.com/why-asurint/our-technology (stating that "Asurint's National Criminal Information Bureau (NCIB) database is made up of aggregated criminal public record data from counties and courts across the country," allowing customers to "[i]nstantly search more than half a billion criminal records").

[13] Broken Record Redux, *supra* note 2, at 10.

[14] *Id.* at 3.

[15] *Id.* at 10.

- **The report.** The screening company creates the resulting background check, including any records matched from its databases, and provides it to the landlord or employer.[16] Increasingly, the report also includes an "adjudication" or "score," which provides an overall recommendation to an employer or landlord about whether to accept the particular consumer.[17] The eligibility criteria can be provided by the user of the report, or developed by the screening company.[18] The report is generally provided online, through the screening company's web portal or a web-based integration.[19]

Unfortunately, such procedures have created a perfect storm for inaccurate reporting. Data may be infrequently acquired and updated, leading to stale, outdated information — including expunged or sealed criminal convictions, obsolete arrest or other non-conviction records, or sealed or obsolete evictions — appearing on background check reports.[20]

---

[16] Market Snapshot, *supra* note 1, at 8-9.

[17] Broken Record Redux, *supra* note 2, at 12-15 (explaining how adjudication works and that adjudication services "appear to have before more prevalent" in recent years). *See also Goode v. LexisNexis Risk & Info. Analytics Grp., Inc.*, 848 F. Supp. 2d 532, 535 (E.D. Pa. 2012) (describing adjudication procedure for pre-employment screening).

[18] Broken Record Redux, *supra* note 2, at 13.

[19] Sterling, *Client Experience*, https://www.sterlingcheck.com/client-experience/ (explaining that Sterling's online "Order Manager makes reviewing and navigating results a whole lot simpler," proving "[a]n easy-to-read report with color-based results and collapsible/expandable search results").

[20] Broken Record Redux, *supra* note 2 at 19; Market Snapshot, *supra* note 1, at 12 ("If a background company's external or internal database updates do not align

Moreover, background screeners are not just passing through data. They make active decisions as to how to match data to individual consumers. Decisions favoring over-inclusiveness and loose matching criteria are intentional choices that result in falsely tagging the wrong consumers with criminal and eviction records.[21] For example, background screeners, including The Source for Public Data, typically match information in criminal records databases using only first name, last name, and date of birth, while some rely on name-only matches.[22]

All told, the digitization and automation of background checks leads to inaccurate, out-of-date, obsolete, and incomplete background reports that frequently deprive people of work, housing, and other opportunities.[23] Thus, while easy access to online records and the shift to entirely web-based background check systems have been profitable for the booming industry, they have created new risks for consumers.

---

with the frequency of a court's record updates, it could lead to incomplete reporting or reporting of expunged or dropped cases.").

[21] *See* Lauren Kirchner & Matthew Goldstein, *Access Denied: Faulty Automated Background Checks Freeze Out Renters*, The Markup & N.Y. Times, May 28, 2020, available at https://themarkup.org/locked-out/2020/05/28/access-denied-faulty-automated-background-checks-freeze-out-renters ("Screening company employees have stated in lawsuits that they err on the side of including any possible match, rather than excluding possible errors.").

[22] Broken Records Redux, *supra* note 2, at 18.

[23] *Id.* at 18 ("The use of unsophisticated or over-inclusive matching criteria, along with the use of incomplete data and the failure to use all available information, leads to mismatched reports—reports that contain the criminal history of a person other than the subject of the report."). *See generally* Kirchner & Goldstein, *supra* note 21 (reviewing hundreds of federal lawsuits filed against tenant screening companies over the past 10 years resulting from inaccurate reports).

Especially given recent changes to the size and nature of the background screening industry, it is critical that the FCRA continue to provide protection to the subjects of such reports: everyday people applying for jobs, housing, and much more.

### C. The Impacts of Inaccurate Reporting on Consumers and How the FCRA Has Helped.

Today, background checks are too often riddled with inaccuracies — precisely what Congress intended to prevent when it passed the FCRA. Some of the most common errors now include:

- matching and ultimately reporting the wrong person's criminal record or eviction record (e.g., a "mismatch" or false positive);

- misclassifying the severity of an offense (e.g., reporting misdemeanors as felonies and infractions as misdemeanors);

- reporting incomplete information (e.g., omitting court action subsequent to arrest or conviction or to filing of an eviction action);

- reporting sealed, expunged, or obsolete records; and

- reporting a single incident with multiple criminal charges as separate incidents.[24]

Such inaccuracies have real-world consequences, particularly for already vulnerable people. From causing the loss of a much-needed job opportunity, to

---

[24] *See generally* Broken Records Redux, *supra* note 2, at 17-21.

denying a shot at stable and affordable housing, an inaccurate background report can be devastating. Even where a consumer disputes an inaccurate report and the report is corrected, the job opportunity or apartment can vanish in the time it takes for the report to be fixed. Moreover, even when a background check company revises a report to remove an inaccuracy, the company sometimes includes the same inaccurate information in a later report on that same consumer.

This nightmare scenario was recounted by Judge Mark Walker, upholding a $3 million verdict against a background check company:

> You're a college-educated, law-abiding citizen with no criminal record. Given the abysmal post-recession job market, you cast a broad job-search net. Many employers deny you, few interview you, and even fewer seriously consider you for a position. Finally, you hear the words that you have been waiting for: "Welcome aboard (pending a criminal-background check)!" But you have nothing to fear—you've never been arrested, let alone convicted of a crime. Nonetheless, you eventually receive a letter notifying you that, apparently, you were arrested and convicted for selling cocaine. Knowing that to be untrue, you successfully dispute the report. But it's too late—the employer already hired somebody else for the job.

> Dejected, you continue your search and, after an even more strenuous search, you finally hear those magic words again. Yet this time, you receive a letter notifying you that you committed burglary and aggravated battery on a pregnant woman. You're disgusted to have been accused of such a heinous crime, and you, yet again, successfully dispute the report. *Déjà vu*; it's too late, the employer has moved on, and it takes five months for you to convince them that you are not a criminal so that they are finally willing to bring you on board. What are you to do—give up and accept your fate, or file a Fair Credit Reporting Act lawsuit?

15

*Williams v. First Advantage LNS Screening Sols., Inc.*, 238 F. Supp. 3d 1333, 1338

(N.D. Fla. 2017).

While inaccuracies within background reports can be devastating enough for

consumers, scoring or adjudication services only make matters worse. When reports

are scored and adjudicated, oftentimes a landlord or employer never reviews, or even

receives, the underlying report. Instead, they simply receive a notification about

whether the job applicant or employee meets the eligibility criteria. This means that

a consumer might be denied housing or a job due to an inaccuracy, without their

potential landlord or employer even *seeing* the inaccuracy and having an opportunity

to recognize it as such. Moreover, applicants generally have very little insight into

why they were rejected.[25]

Pervasive inaccuracies in background check reports produced by screening

companies also have a disparate and devastating impact on Black and Latinx people.

As a result of over-policing, Black and Latinx people are disproportionately likely

to have an arrest or conviction record and consequently to face exclusions from jobs

and housing based on those records.[26] According to a Department of Justice study, a

---

[25] *Id.* at 14.

[26] Although Black Americans make up approximately 13.4% of the U.S. population, they comprised 27% of all individuals arrested as of 2016. United States Census Bureau, *Quick Facts*, available at https://www.census.gov/quickfacts/fact/table/US/PST045219#qf-headnote-a; FBI Uniform Crime Reporting Program, *Crime in the United States 2016*, available at https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/. The Equal

16

criminal conviction of any sort reduced the likelihood of a job offer by 50% and the

negative effect of having a conviction was twice as large for Black job-seekers as

compared to their white counterparts.[27] Criminal records similarly affect the ability

of those with criminal records "to access safe, secure and affordable housing."[28]

Additionally, Black tenants, and particularly Black women, are disproportionately

targeted with eviction proceedings.[29]

     The disproportionate arrest and conviction of Black and Latinx people, as well

as the disproportionate initiation of eviction proceedings against these communities,

result in disparate harm from errors in background checks, such as failure to report

---

Employment Opportunity Commission has recognized the disproportionate rates of arrest, conviction, and incarceration of Black and Latinx people and issued guidance stating data supports finding that criminal records exclusions will have a disparate impact based on race and national origin. *See* U.S. Equal Employment Opportunity Commission, *Enforcement Guidance on the Consideration of Arrest and Conviction Records in Employment Decisions under Title VII of the Civil Rights Act*, available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-consideration-arrest-and-conviction-records-employment-decisions.

[27] Brennan Center for Justice, *Just Facts: As Many Americans Have Criminal Records as College Diplomas* (2015), available at https://www.brennancenter.org/our-work/analysis-opinion/just-facts-many-americans-have-criminal-records-college-diplomas (citing https://www.ojp.gov/pdffiles1/nij/grants/228584.pdf)

[28] HUD, *Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* (Apr. 4, 2016), available at https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF

[29] ACLU, *Unfair Eviction Screening Policies Are Disproportionately Blacklisting Black Women* (March 30, 2017), available at https://www.aclu.org/blog/womens-rights/violence-against-women/unfair-eviction-screening-policies-are-disproportionately.

complete records or reporting sealed or expunged records. As the current head of the Consumer Financial Protection Bureau, Rohit Chopra, recently emphasized in his statement regarding charges brought against a tenant screening company, "[w]hen it comes to opportunities like housing and employment, background screeners can play a pivotal role in determining whether an applicant is accepted or denied, since they provide detailed dossiers of personal information. If their practices are discriminatory, they can and should be held accountable."[30]

Finally, the proliferation in the number of background screening companies poses another challenge for consumers. Unlike the traditional credit reporting industry which is dominated by the "Big 3" credit reporting agencies (TransUnion, Experian, and Equifax), there are thousands of companies that specialize in criminal background screening. Because of the sheer number of companies that sell background checks, it is nearly impossible for a consumer to verify that their background check will be accurate *before* a report is furnished to a potential employer or landlord.

While the background check industry continues to pose serious and evolving threats, for the past 50 years, the FCRA has at least provided consumers with a tool

---

[30] FTC, *Dissenting Statement of Commissioner Rohit Chopra* (Dec. 8, 2020), available at https://www.ftc.gov/system/files/documents/public_statements/1584330/20201208_final_chopra_statement_on_appfolio_-_updated_0.pdf.

to enforce their rights and obtain sweeping reforms. As the result of settlements and litigation, some CRAs have somewhat improved their matching procedures, overhauled their data collection processes, revamped their obsolescence filters, and paid millions of dollars in relief to aggrieved consumers.[31] Federal regulators have also brought successful FCRA actions. In recent years, for example, the Federal Trade Commission (FTC) obtained millions of dollars in civil penalties against two tenant screening companies for issuing inaccurate reports, while the CFPB obtained $6 million in monetary relief for affected consumers and $2.5 million in civil penalties — along with injunctive relief — against another CRA accused of FCRA violations.[32]

---

[31] *See, e.g., Roe v. IntelliCorp Records, Inc.*, No. 12-cv-2288 (N.D. Ohio Nov. 12, 2013) (ECF No. 124) (providing $18 million dollars for consumers subjected to inaccurate reports and prohibiting defendant from selling "instant" background checks); *Thomas v. Backgroundchecks.com*, No. 3:13-cv-029 (E.D. Va. Feb. 20, 2015) (ECF No. 78) (providing $18 million dollars for consumers subjected to inaccurate reports and mandating improvement to defendant's processes); *Ernst v. Sterling Infosystems, Inc.*, No. 1:12-cv-8794 (S.D.N.Y. Jan. 9, 2015) (ECF No. 139) (providing $4.75 million for consumers with obsolete information on their background checks and requiring changes to processes for filtering out old information).

[32] FTC, *Texas Company Will Pay $3 million to Settle FTC Charges That it Failed to Meet Accuracy Requirements for its Tenant Screening Reports* (Oct. 16, 2018), available at https://www.ftc.gov/news-events/press-releases/2018/10/texas-company-will-pay-3-million-settle-ftc-charges-it-failed; CFPB, *Consumer Financial Protection Bureau Settles with Employment Background Screening Company* (Nov. 22, 2019), available at https://www.consumerfinance.gov/about-us/newsroom/bureau-settles-employment-background-screening-company/; FTC, *Tenant Background Report Provider Settles FTC Allegations that it Failed to Follow Accuracy Requirements for Screening Reports* (Dec. 8, 2020), available at

FCRA lawsuits and enforcement actions have been essential in forcing background screening companies to take steps to improve the accuracy and fairness of their reports, as Congress intended. The effect of these protections can be seen by the increasingly clever legal arguments mounted by such companies to avoid their clear obligations under the FCRA. For example, some CRAs have argued that they are not subject to the Act at all because they simply provide the results of public records searches, and not reports about any particular individual. *See, e.g., Henderson v. Corelogic Nat'l Background Data, LLC*, 161 F. Supp. 3d 389, 393 (E.D. Va. 2016) (describing and rejecting defendant's argument that its reports are not covered by the FCRA because the company "provides data in its raw form, which is *not descriptive about any one person,* but rather is simply a movement of data in response to the search queries provided by its customers") (internal quotation marks omitted; emphasis in original). And reliance on data that is provided by companies that disclaim that the FCRA applies can result in unjust denials of housing, employment, credit, or other benefits.[33]

---

https://www.ftc.gov/news-events/press-releases/2020/12/tenant-background-report-provider-settles-ftc-allegations-it.

[33] *See* NCLC, *Mismatched and Mistaken*: *How the Use of an Inaccurate Private Database Results in SSI Recipients Unjustly Losing Benefits* (Apr. 2021), available at https://www.nclc.org/images/pdf/credit_reports/RptMismatchedFINAL041421.pdf (describing how government's reliance on non-FCRA data product that wrongly suggested that applicants for public benefits owned unreported real property recipients resulted in unjust denials of SSI benefits).

Given the broad scope of the FCRA, however, and Congress' foundational goal in crafting it — to protect consumers and the economy by ensuring the accuracy of background checks — courts have consistently affirmed the importance and applicability of the FCRA's many protections, providing substantial relief to consumers through lawsuits even against companies that have insisted that the FCRA does not apply to them. *Berry v. Schulman*, 807 F.3d 600, 604 (4th Cir. 2015) (describing "sweeping" relief against a company that asserted that it did not sell consumer reports governed by the FCRA).

If affirmed, the district court's decision would encourage background check companies to shirk their intended and well-settled obligations under the FCRA and deliver a shocking blow to consumers. However, as *amici* argue below, Section 230 does not apply to the provisions of the FCRA at issue in this case, and as such, the district court's decision should be reversed.

## II.    Section 230 Does Not Immunize Background Check Companies and Other CRAs from Complying with Their Obligations Under the FCRA

Section 230 plays an important role in protecting people's ability to communicate freely on the internet. When Congress passed Section 230, it observed that the internet was "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." 47 U.S.C. § 230(a)(3). Indeed, today, the "prototypical service qualifying for

[Section 230] immunity is an online messaging board (or bulletin board) on which Internet subscribers post comments and respond to comments posted by others." *FTC v. Accusearch Inc.,* 570 F.3d 1187, 1195 (10th Cir. 2009). Contrast this public-facing discourse with the FCRA's goal to keep sensitive information private and ensure that it is only provided to users with a legitimate need for the information, *i.e.* a permissible purpose. *See* 15 U.S.C. § 1681b.

To help promote this vision of the internet, Section 230 states that "[n]o provider or user of an interactive computer service shall be *treated as the publisher or speaker* of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). However, none of the provisions of the FCRA at issue in this case treat CRAs as publishers or speakers. Thus, Section 230's protections do not apply. Further, to the extent that any part of the FCRA does treat CRAs as publishers or speakers, Section 230 does not provide immunity when — as they often do — CRAs create or develop content in the consumer reports they sell.

### A. None Of The Statutory Obligations Enumerated In The Plaintiffs' Complaint Require A Court To Treat A CRA As The Publisher Or Speaker Of Third-Party Content.

In applying Section 230 to dismiss the Plaintiffs' complaint, the district court erroneously failed to analyze the FCRA provisions under which Plaintiffs make their claims. Section 230 provides protection against liability when a plaintiff's claim "*inherently requires* the court to treat the defendant [an interactive computer service]

22

as the 'publisher or speaker' of content provided by another." *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) (emphasis added). However, none of the FCRA provisions at issue in this case require a court to treat a CRA as a "publisher or speaker," and none of them impose liability for publishing inaccurate information from third parties. Rather, they require CRAs to establish and follow procedures to ensure that reports are accurate (*see* § 1681e(b)), to provide various disclosures to consumers (*see* § 1681g and § 1681k(a)(1)), and to obtain certifications from certain purchasers of consumer reports (*see* § 1681b(b)(1)).

For example, § 1681g requires a CRA to disclose information to consumers under certain circumstances, and § 1681b(b)(1) requires CRAs to obtain certifications from people who obtain reports for employment purposes. Neither provision has anything to do with the publication of third-party content. Instead, any liability under these provisions arises from a failure of a CRA to conduct itself as Congress instructed — not because they are the publisher or speaker of third-party content. *See, e.g., Brown v. Equifax Info. Servs., LLC*, No. 09-CV-0168, 2010 WL 11647403, at *11 (N.D. Ga. Feb. 16, 2010) (explaining that Section 1681g is "violated when a consumer requests his or her entire credit file and *the credit file is not produced* for the consumer") (emphasis added); *Obabueki v. IBM*, 145 F. Supp. 2d 371, 394–96 (S.D.N.Y. 2001) (granting summary judgment to plaintiff on their § 1681b(b)(1)(A)(i) claim because defendant "failed to demonstrate that there is any

issue of material fact as to their *failure to obtain the required certification* before providing" plaintiff's credit report to the employer) (emphasis added).

Section 1681e(b) requires CRAs to "*follow reasonable procedures* to assure maximum possible accuracy [of consumer reports]." § 1681e(b) (emphasis added). It does not impose liability for publishing inaccurate information from a third party, nor does it require treating a CRA as a publisher or speaker. *See Henson v. CSC Credit Services*, 29 F.3d 280, 285 (7th Cir. 1994) ("A credit reporting agency is not liable under the FCRA if it followed 'reasonable procedures to assure maximum possible accuracy,' but nonetheless reported inaccurate information in the consumer's credit report."); *Sarver v. Experian Information Solutions*, 390 F.3d 969 (7th Cir. 2004) (following *Henson* and holding that CRA not liable for inaccuracies in information obtained from reliable financial institutions). Rather, liability under § 1681e(b) turns on whether proper procedures were followed. *See Cortez v. Trans Union, L.L.C.*, 617 F.3d 688, 708 (3d Cir. 2010) (plaintiffs must prove not only that there was an inaccuracy, but that "the inaccuracy was *due to*" the CRA's own procedures and lack of safeguards (emphasis added)); *Dalton v. Cap. Associated Indus., Inc.*, 257 F.3d 409, 416 (4th Cir. 2001) (reversing grant of summary judgment for defendant where plaintiff "created a dispute of material fact as to whether CAI followed unreasonable procedures by failing to instruct its subvendors on the proper sources of criminal history information"); *Koropoulos v. Credit Bureau, Inc.*, 734

24

F.2d 37, 42 (D.C. Cir. 1984) ("The [FCRA] does not flatly require maximum possible accuracy, only that the consumer reporting agency must follow *reasonable procedures* to assure such accuracy.") (emphasis in original).

As described above, many § 1681e(b) claims involve CRAs wrongly matching records to a particular individual where those records pertain to a different individual with a similar name. Here, too, the question is not whether the public record itself was accurately transcribed or obtained from the source of the public record information, but rather whether the CRAs "follow reasonable procedures*"* that provide assurance that the records that they attribute to an individual indeed belong to that individual.

These analytical boundaries are critical to proper application of Section 230, which "does not provide a general immunity against all claims derived from third-party content." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016). And for good reason: Section 230 "was not meant to create a lawless no-man's-land on the Internet." *Fair Housing Council of San Fernando Valley v. Roommates.com*, 521 F.3d 1157, 1164 (9th Cir. 2008); *see also Barnes*, 570 F.3d at 1100 ("to 'provid[e] immunity every time a website uses data initially obtained from third parties would eviscerate [the statute].") (quoting *Roommates.com*, 521 F.3d at 1171) (brackets in original).

25

For instance, Section 230 does not interfere with legal requirements that service providers follow certain procedures to ensure that their business transactions comply with local law. *HomeAway.com v. Santa Monica*, 918 F.3d 676 (9th Cir. 2019). In *HomeAway*, a local statute prohibited vacation rental platforms from booking any properties not registered with the city. AirBnB and HomeAway claimed Section 230 immunized them from complying with this provision. The Ninth Circuit disagreed, holding that requiring a platform to cross-reference rental properties against the city property registry before allowing a booking transaction to proceed is not related to publication of content. The ordinance did not require the platforms to review the content provided by the hosts of listings, so Section 230 did not apply.

Nor does Section 230 apply to legal duties that do not "otherwise affect how [the defendant] publishes or monitors" user content. *Internet Brands*, 824 F.3d at 851. In *Internet Brands*, the website-operators knew that two individuals were using the website to lure women into meetings where they would be drugged and raped. *Id.* at 848. The court held that Section 230 did not immunize the operators from a duty to warn, because it would not "otherwise affect how [the defendant] publishes or monitors" user content and did not seek to hold the defendant liable as a "publisher or speaker" of third-party content. *Id.* at 853.

Where, as here, plaintiffs allege violations of FCRA provisions that impose liability for affirmative conduct that does not entail publishing of third-party content,

26

the fact that CRAs may convey reports online does not immunize their conduct under Section 230.

### B. CRAs Are Not Eligible for Section 230 Protection When They Create and Develop Content.

Section 230 does not protect CRAs from liability for publishing content they have created or developed. Section 230 shields interactive computer services from liability arising from their role as a publisher or speaker of "information provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). Where an entity is "responsible, *in whole or in part*, for the creation or development" of content, *id.* at § 230(f)(3) (emphasis added), they are themselves acting as an information content provider and are not protected under Section 230 with respect to claims arising from that content.

For example, Section 230 did not immunize Facebook for its "Sponsored Stories" ads, which took users' names, photographs, and likenesses to create an ad published as an endorsement of third-party products on which the person had clicked "like." *Fraley v. Facebook*, 830 F. Supp. 2d 785 (N.D. Cal. 2011). Because Facebook contributed to the creation or development of the Sponsored Story that ultimately appears on the service, Section 230 did not apply even though users provided some of the information by clicking the "like" button on a website. Similarly, even where third parties provide underlying information about individuals, Section 230 does not immunize actors when they build on that

27

information to create their own content. *See Diamond Ranch Academy v. Filer*, No. 14-751, 2016 WL 633351, \*\*21-22 (D. Utah Feb. 17, 2016) (Section 230 does not apply to website operator who used third party content to create comments, post her own articles, and summarize the statements of others). Service providers are liable, and do not enjoy Section 230 protection, when their actions create content that violates a legal obligation.

In the same way, most CRAs engage in a wide array of conduct that falls squarely into the category of content creation or development. For example, when creating consumer reports, CRAs will often attach labels to criminal records, such as "misdemeanor," "traffic," or "property," to standardize records from different jurisdictions that use widely varying systems for classifying offenses. The criminal records themselves are third party content, but the labels are content created by the CRA for which Section 230 protection does not apply. Likewise, reports often include an overall recommendation to an employer or landlord about whether to accept the consumer, or other inferential data, such as a credit score or tenant score. This new, composite informational product is clearly created by the CRA and not by a third party, even if it is based on third party-provided information. As a result, CRAs are not shielded under Section 230 from liability stemming from these kinds of reports.

28

Given the brevity of the district court's opinion, *amici* urge this Court to issue a ruling — consistent with longstanding Section 230 precedent — that clearly preserves the FCRA obligations of CRAs in their creation and development of content.

## CONCLUSION

The district court's decision limiting the reach and scope of the FCRA would deprive consumers of a highly effective remedy for inaccurate reporting, and is not supported by the purpose or text of Section 230. Reversal is required.

Respectfully submitted,

Date:  October 15, 2021

/s/John G. Albanese
John G. Albanese
Ariana Kiener
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel.: 612.594.5999
Fax: 612.584.4470
jalbanese@bm.net
akiener@bm.net

*Counsel for Amici Curiae National Consumer Law Center, Upturn, American Civil Liberties Union, National Housing Law Project, National Employment Law Project, and National Low Income Housing Coalition*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and 29(a)(5) because this brief contains 6,427 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been preparing proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Date: October 15, 2021              /s/John G. Albanese
                                    John G. Albanese
                                    Ariana Kiener
                                    BERGER MONTAGUE PC
                                    1229 Tyler Street NE, Suite 205
                                    Minneapolis, MN 55413
                                    Tel.: 612.594.5999
                                    Fax: 612.584.4470
                                    jalbanese@bm.net
                                    akiener@bm.net

                                    *Counsel for Amici Curiae National
                                    Consumer Law Center, Upturn, American
                                    Civil Liberties Union, National Housing
                                    Law Project, National Employment Law
                                    Project, and National Low Income Housing
                                    Coalition*